# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ ) | | |
| In the Matter of the Arbitration between | ) | |
| | ) | |
| RAYMOND L. LOEWEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | Matter 1:04CV02151 (RWR) |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |
| _____ ) | | |

## OPPOSITION TO PETITIONER'S MOTION TO VACATE
## AND REMAND ARBITRATION AWARD

Petitioner Raymond Loewen seeks to have this Court vacate a unanimous arbitration award rendered by a Tribunal of three eminent jurists under the North American Free Trade Agreement (NAFTA) through procedures he selected. Notably, he has already made the same arguments that he now raises before this Court to the Tribunal itself in an improper attempt to have that panel reconsider his claims. Having been rebuffed in that attempt, he now attacks that Tribunal as careless, unethical, and dishonest. Mr. Loewen's arguments, ad hominem or otherwise, fail to survive even casual scrutiny, let alone satisfy the high standard necessary to vacate a final arbitration award.

First, this Court need not even entertain this petition as it is untimely. The Federal Arbitration Act (FAA) granted petitioner just three months from the date of the underlying arbitration award to seek vacatur. Here, that award issued in June 2003, eighteen months before

1

the petition was served and fifteen months after the FAA's limitations period expired.  Seeking to avoid this result, petitioner contends that the time did not begin to run until after the Tribunal had denied a subsequently filed Request for a Supplementary Decision from the United States.  The FAA's three-month period, however, is not tolled where, as here, a party to an arbitration files a request to clarify an arbitral award.  Moreover, even if the filing of the Request for a Supplementary Decision did toll the three month period, this petition is still untimely.  As the Request was submitted on the forty fifth day after the Award, petitioner had, at most, an additional 45 days to file this petition, a period that started on the day that the Tribunal denied the United States' supplementary request, September 13, 2004.  The filing of this petition on December 13, 2004, therefore, was approximately 46 days too late even under that generous standard.

Second, the Tribunal issued a "mutual, final, and definite award upon the subject matter submitted."  A plain reading of the Award demonstrates that petitioner's claims were decided on the merits.  Petitioner carefully refers to his claims as the Article 1116 claim.  But Article 1116 is nothing more than a jurisdictional provision which gives him a personal right to seek recovery under the NAFTA.  Any claim, however, must be based on a violation of a substantive provision of the NAFTA, as Article 1116 itself makes clear.  Here, invoking his personal right of action under Article 1116, petitioner brought three substantive claims based on Articles 1102, 1105, and 1110.  The Award, while not referring to petitioner's Article 1116 claim, does refer to and decide each of the three substantive claims on the merits.  This necessarily disposed of any Article 1116 claim brought by petitioner.

Third, the Tribunal did not manifestly disregard the law or ignore the evidence presented by the claimants.  Petitioner asserts that the Tribunal relied on subjective evidence to satisfy an objective test for determining whether his co-claimant, The Loewen Group, Inc. (TLGI), should have sought to remedy the Mississippi supersedeas-bond requirement by petitioning for a stay and for a writ of certiorari to the United States Supreme Court or by filing for bankruptcy.  He further contends that, if subjective evidence was required, the Tribunal ignored his evidence of what the TLGI Board of Directors subjectively thought of the various options before it.

Petitioner's argument misreads the Tribunal's award.  The award establishes that, after considering the parties' expert opinions on the reasonable availability of the various options – opinions based on TLGI's then-existing circumstances – the Tribunal found that the claimants' expert evidence was insufficient to carry their burden of proof because it was in direct conflict with the expert evidence provided by the government.  The Tribunal then went an extra step and considered petitioner's proffered evidence on the facts involved in the TLGI Board of Directors' decision to settle.  But it did so not to determine the Board's subjective state-of-mind, which was irrelevant, but to see what, if any, objective facts the Board relied upon when it decided to settle the Mississippi judgment.  Such facts could have impacted the Tribunal's analysis.  As petitioner's submissions were bereft of such information, the Tribunal correctly held that petitioner failed to carry his burden of proof on this issue.

And lastly, the Court should uphold the arbitral Award because it was supported by ample evidence.  This Court does not sit to correct factual or legal mistakes made by any arbitration panel.  It is well-settled that the Court need only find colorable support for the arbitrators' unanimous decision to uphold it.  Here, the government's evidence, especially that of its experts,

provides ample proof that both the Supreme Court option and the bankruptcy option were reasonably available.  For all these reasons, there is no basis to set aside this Award.

## BACKGROUND

### The Dispute That Gave Rise To The Arbitration

Petitioner Raymond Loewen was the founder, principal shareholder, and Chief Executive Officer of TLGI.  Ex. 1, Award ¶ 9.  TLGI was a Canadian corporation that acquired and operated funeral homes and related businesses throughout North America.  Award ¶¶ 9, 32.  Its principal subsidiary in the United States was the Loewen Group International, Inc. (LGII).  Award ¶ 3.

The Mississippi state court action at the core of this case had its genesis in the acquisition by LGII of a Mississippi funeral home.  In the 1980s and early 1990s, TLGI had embarked on an ambitious business plan of growth through acquisition.  See Award ¶ 32.  As part of this plan, TLGI purchased the funeral homes and related businesses of the Reimann family of Gulfport.  Award ¶¶ 31, 32.  In neighboring Biloxi, the funeral home business was dominated by the O'Keefe family.  Award ¶ 31.  As part of their business, the O'Keefes had built a successful combination of funeral insurance companies, which operated under an umbrella company known as the Gulf Group, Inc.  Ex. 2, Counter-Memorial of the United States of America (Counter-Memorial) at 11; see Award ¶ 31 (collectively the O'Keefe family and their businesses will be referred to as O'Keefe).  After acquiring the Reimann business, TLGI also purchased the Wright & Ferguson Funeral Home in Jackson.  Award ¶ 33.  Since 1974, O'Keefe had had the exclusive contractual right to sell funeral insurance through the Wright & Ferguson Funeral Home.  Award

4

¶ 33.  After acquiring the funeral home, TLGI breached O'Keefe's exclusive right to sell insurance by offering its own lines of insurance there.  Award ¶ 34.

O'Keefe sought to negotiate a settlement over this straightforward contract dispute. Award ¶ 34.  When negotiations failed, O'Keefe filed a breach of contract suit in Mississippi state court in April 1991.  Award ¶ 34.  Subsequently, on August 19, 1991, O'Keefe,  TLGI, and Raymond Loewen reached a settlement.  Award ¶ 35.  Under its terms, the Loewen parties agreed to sell an insurance company and a related fund to O'Keefe and to provide O'Keefe with the exclusive right to provide certain insurance policies sold through Loewen funeral homes. Counter-Memorial at 14.  In exchange, O'Keefe agreed to dismiss the lawsuit, to sell two funeral homes to Loewen, and to assign an option to purchase a cemetery tract.  Id.  The total value of all these transactions was estimated to be approximately $4 million.  Award ¶ 13.

Prompt implementation of the settlement agreement was critical to O'Keefe.  The O'Keefe insurance companies needed an infusion of cash to meet state regulatory requirements.  Counter-Memorial at 13; see Award ¶¶ 34-35.  With a periodic review by state regulators scheduled to begin shortly, O'Keefe needed to have performance of the settlement agreement occur within 120 days.  Counter-Memorial at 15.  Evidence was introduced at trial that TLGI and Mr. Loewen were aware of O'Keefe's difficulties and endeavored to stall completion so that O'Keefe's insurance companies would fall into difficulty.  Id.  When the deal did not close as anticipated, O'Keefe's insurance companies were placed under administrative supervision by Mississippi, emerging over one year later.  Id. at 15-16; Award ¶ 38.  In the meantime, O'Keefe had been forced to sell four funeral homes to TLGI's main competitor, Service Corporation International,

to replace the cash from the settlement that O'Keefe had intended would restore the viability of its insurance companies.  Counter-Memorial at 16.

O'Keefe then renewed its lawsuit against TLGI and Mr. Loewen, adding claims of fraud in the inducement and antitrust violations.  Award ¶ 37.  O'Keefe alleged that TLGI fraudulently settled having no intention of honoring the agreement, instead fully intending to willfully breach to drive O'Keefe into insolvency and eliminate O'Keefe as a local competitor.  Counter-Memorial at 16.  O'Keefe alleged that the defendants' actions were part of the company's broader scheme to monopolize funeral home markets by destroying the competition.  Id.

**The Trial, the Judgment, and the Supersedeas Bond**

The case was tried to a jury over approximately seven weeks.  Award ¶ 120.  The jury initially returned a verdict of $260 million of which the trial judge attributed only $100 million to compensatory damages and the remainder to punitive damages.  Award ¶ 92, 94.  Because state law required a separate trial phase to assess punitive damages, the judge reformed the verdict, accepting only the $100 million in compensatory damages.  Award ¶ 96.  After subsequent proceedings on punitive damages, at which the jury heard evidence of TLGI's net worth for the first time, the jury awarded $400 million in punitive damages.  Award ¶ 97; Counter-Memorial at 56.  The court entered judgment on the entire $500 million verdict.  Award ¶ 101.

Rejecting the United States' arguments to the contrary, the Tribunal found that the conduct of the Mississippi trial was improper because "the tactics of O'Keefe's lawyers . . . were impermissible" and TLGI was, thus, not offered all the process it was due.  Award ¶ 119.[1]

---

[1]  The Tribunal was concerned with what it characterized as repeated references to race, nationality, and class by the O'Keefe trial team, Award ¶¶ 56-70.  During the proceedings before the Tribunal, the United States asserted that the Loewen lawyers also referenced race in their

Nevertheless, the Tribunal found that those proceedings would not breach the NAFTA unless the judicial process available to TLGI could not have corrected the errors of the lower court.  <u>See</u> Award ¶ 137.  Resolution of that question needed to await an exploration of the judicial remedies that were reasonably available to the claimants.

Under Mississippi law, TLGI had an absolute right to appeal the trial court's judgment. Miss. Code Ann. § 11-51-3.  But to stop execution on that judgment pending appeal, TLGI needed to post a supersedeas bond in the amount of 125% of the judgment.  Miss. R. App. P. 8(a).  Given that the judgment was $500 million, the unrecoverable cost to have third-parties post a bond securing $625 million was approximately $200 million.  Ex. 3, Notice of Claim ¶ 5. Accordingly, TLGI moved the trial court to reduce the supersedeas bond to only $125 million, the amount that it contended it could afford (and, coincidentally, 125% of the $100 million compensatory award).  Award ¶ 180.  The trial court denied the motion.  Award ¶¶ 182-183.

TLGI immediately appealed the trial court's supersedeas-bond decision to the Mississippi Supreme Court, while also seeking a stay of execution.  Counter-Memorial at 59-60.  One day after the trial court's ruling, the Supreme Court granted the temporary stay.  <u>Id</u>.; Award ¶ 190.  As a condition of the temporary stay, however, the Supreme Court required Loewen to post the $125 million bond, which TLGI had represented, as it had before the trial court, was all it could afford.

---

case, and that they had waived any right to complain about the O'Keefe's tactics by choosing not to object.  Counter-Memorial at 21-32.  Moreover, the government also asserted that the verdict was not the result of improper appeals to nationality, race, or class, but rather reflected the jury's finding that TLGI was a dishonest and predatory company that had set out to destroy the O'Keefe business.  <u>Id</u>. at 17-32.  The Tribunal concluded however, that the race, nationality, and class references by O'Keefe's counsel were part of a strategy to paint TLGI and Raymond Loewen as outsiders.  Award ¶ 70.

Counter-Memorial at 60; Award ¶ 190.  Circumstances would shortly lead the Mississippi

Supreme Court to conclude otherwise.

Having obtained a stay of execution, TLGI and Raymond Loewen sought to reembark on

their aggressive acquisition strategy by seeking to raise capital.  Counter-Memorial at 61; Award

¶¶ 192-193.  They pursued this course in the face of contrary advice from their own counsel, who

were concerned that it would appear that TLGI had a greater financial capacity to post a full bond

than it represented.  Counter-Memorial at 61-62; Award ¶ 191.  In seeking to assure the capital

markets, however, Raymond Loewen had already suggested that TLGI was able to finance the

full $625 million supersedeas bond in a conference call with investors.  Counter-Memorial at 62;

Award ¶ 194.  The O'Keefe lawyers, having obtained a transcript of the call, filed a brief with the

Mississippi Supreme Court charging that TLGI had perpetrated a fraud on the court by claiming

to be unable to post the full bond.  Counter-Memorial at 62.  Subsequently, on January 24, 1996,

an en banc panel of the Mississippi Supreme Court denied TLGI's request for a reduction in the

supersedeas bond and ordered that the temporary stay on execution be lifted in seven days unless

the full bond was posted.  Award ¶ 196.

After the Mississippi Supreme Court lifted the stay, TLGI had several options to continue

to appeal.  First, it could have proceeded without posting a bond, forcing O'Keefe, if it chose to

execute, to risk reversal on appeal and the need to return any seized property and to compensate

TLGI for any losses incurred.  Counter-Memorial at 63.  Second, it could have posted the full

amount of the bond and stayed execution pending appeal.  Id.  Third, it could have petitioned the

U. S. Supreme Court to review the Mississippi Supreme Court's supersedeas-bond decision,

seeking a stay of the bond decision while the petition was pending.  Id.  And last, it could have

filed for protection under Chapter 11 of the Bankruptcy Code – thereby automatically staying any attempts to execute on the judgment and allowing the appeal to proceed without any bond.  Id.

Instead, TLGI and Raymond Loewen chose yet another option, electing to settle the case with O'Keefe.  On January 29, 1996, they agreed that: (1) O'Keefe would receive $50 million in cash; (2) Loewen would issue O'Keefe 1.5 million restricted shares of TLGI stock; and (3) Loewen would issue an unsecured note to O'Keefe promising annual payments of $4 million for the next twenty years.  Counter-Memorial at 64.  In an SEC filing, TLGI estimated the net present value of this settlement to be approximately $85 million.  Id.

**The Arbitration Claim**

In October 1998, TLGI and Raymond Loewen initiated NAFTA investor-State arbitration against the United States, seeking to recover $725 million in damages stemming from the Mississippi proceedings.  Notice of Claim at 67.  In particular, TLGI and Raymond Loewen alleged that the state court proceedings violated three substantive provisions of the treaty: Articles 1102, 1105, and 1110.  The Notice of Claim does not distinguish between the complainants when alleging the substantive violations.  Id. ¶¶ 139-181.

Article 1102 provides that foreign investors and their investments receive the same treatment accorded to a signatory's own investors and investments in like circumstances.  In particular, Article 1102 states:

> 1. Each Party shall accord to investors of another Party treatment no less favorable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.
>
> 2. Each Party shall accord to investments of investors of another Party treatment no less favorable than that it accords, in like circumstances, to investments of its

> own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.
>
> 3. The treatment accorded by a Party under paragraphs 1 and 2 means, with respect to a state or province, treatment no less favorable than the most favorable treatment accorded, in like circumstances, by that state or province to investors, and to investments of investors, of the Party of which it forms a part.

TLGI and Raymond Loewen alleged in their notice of claim that anti-Canadian comments made by O'Keefe's counsel throughout the trial violated this provision.  Notice of Claim ¶ 139.

TLGI and Raymond Loewen also asserted that the state court proceedings violated Article 1105.  Article 1105 provides in pertinent part:

> 1. Each party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security.

First, TLGI and Raymond Loewen contended that the state proceedings amounted to a substantive denial of justice under international law because of the amount of the judgment – $100 million in compensatory and $400 million in punitive damages – compared to the value of the underlying dispute.  Notice of Claim ¶¶ 145-155.  Second, the complainants contended that the state proceedings were a procedural denial of justice under international law because of the pervasive comments and evidence O'Keefe's legal team made or introduced about the race, nationality, and class of the complainants, id. ¶¶ 156-158, comments which allegedly biased the jury.  Id.  And third, complainants asserted the same actions underlying the substantive and procedural denials of justice also denied them fair and equitable treatment.  Id. ¶¶ 159-160.

Lastly, TLGI and Raymond Loewen alleged that the state court proceedings violated Article 1110.  That provision provides, in part:

1. No party may directly or indirectly nationalize or expropriate an investment of an investor of another Party in its territory or take a measure tantamount to nationalization or expropriation of such an investment ("expropriation"), except:

> (a) for a public purpose;
> (b) on a nondiscriminatory basis;
> (c) in accordance with due process of law and Article 1105(1); and
> (d) on payment of compensation . . ..

TLGI and Mr. Loewen alleged that the large state court judgment and its resulting impact on their business constituted an unlawful expropriation by Mississippi.  Notice of Claim ¶¶ 162-167.

Procedurally, both TLGI and Raymond Loewen invoked both of the private right of action provisions of the NAFTA, Articles 1116 and 1117.  Article 1116 gives foreign investors a right to submit a claim for loss or damage suffered by the investor to their investment in the United States.  In particular, Article 1116 provides:

> 1.      An investor of a Party may submit to arbitration under this Section a claim that another Party has breached an obligation under:
> (a) Section A [which includes Articles 1102, 1105, and 1110] . . .
> > * * *
> and that the investor has incurred loss or damage by reason of, or arising out of, that breach.

Article 1117, on the other hand, permits an investor to submit a claim on behalf of an enterprise that it owns or controls:

> 1. An investor of a Party, on behalf of an enterprise or another Party that is a juridical person that the investor owns or controls directly or indirectly, may submit to arbitration under this Section a claim that the other Party has breached an obligation under:
> > (a) Section A [which includes Articles 1102, 1105, and 1110] . . .,
> > > * * *
> > and that the enterprise has incurred loss or damage by reason of, or arising out of, that breach.

11

Invoking Articles 1116 and 1117, TLGI claimed that the Mississippi proceedings had damaged its investment in LGII, the Reimann acquistion, and the Wright & Ferguson Funeral Home.  Notice of Claim ¶¶ 177, 180.  Similarly, Mr. Loewen claimed to be a substantial shareholder of TLGI, and, through TLGI, in LGII and the Mississippi acquisitions.  Id. ¶¶ 178, 181.  As to both complainants, the putative damage to their investments in LGII stemmed from the alleged substantive violations set forth above.  Id. ¶¶ 177, 178, 180, 181.  Notably, no matter whether brought by TLGI or by Mr. Loewen, or whether brought under Article 1116 or 1117, the liability allegations (and subsequent proof during the arbitration) of the substantive claims (Articles 1102, 1105, and 1110) were identical.  E.g., id. ¶¶ 139-181  Thus, in summary, the Tribunal was asked by TLGI and Raymond Loewen to resolve alleged breaches of three substantive provisions of the NAFTA, namely Articles 1102, 1105, and 1110.

**Selection of the NAFTA Arbitration Tribunal**

As permitted under the NAFTA, the complainants chose to pursue this proceeding under the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes (ICSID).  See Notice of Claim ¶ 19.  Under these rules, the parties agreed that the Tribunal would consist of three individuals: one chosen by each side, and one agreed upon by all parties to serve as President of the Tribunal.  The panel chosen was very qualified and esteemed.  TLGI and Raymond Loewen initially chose Yves Fortier, a well respected lawyer from Canada.  Pet'rs. Mem. at 6.  After the proceedings had commenced, Mr. Fortier resigned his office because of the appearance of a conflict of interest.  Claimants immediately appointed Lord Mustill, a Law Lord from Great Britain, as their new designee.  The United States designated the Honorable Abner J. Mikva, a former Chief Judge of the United States Court of Appeals for the

District of Columbia Circuit.  Id.  To serve as President of the Tribunal, the parties jointly chose

Sir Anthony Mason, former Chief Justice of the High Court of Australia.  See id.

**The Tribunal's Award: Decision on Jurisdiction**

The Tribunal issued its final Award on June 26, 2003, disposing of all the claims brought

by both complainants.  TLGI's claims were all disposed of on jurisdictional grounds, resulting

from its decision to reorganize as a U. S. entity as part of its 1999 bankruptcy.  Award ¶¶ 220-

238.  Raymond Loewen's claims on behalf of LGII and the Mississippi enterprises, which he had

brought under Article 1117, were likewise dismissed on jurisdictional grounds.

After initiating the arbitration, TLGI entered bankruptcy in 1999.  Award ¶ 220.  As part

of the resulting reorganization, TLGI ceased to exist and all of its operations were transferred to a

U. S. corporation.  Award ¶ 220.  TLGI's pending NAFTA claims, however, were transferred to a

newly created Canadian, subsidiary corporation, Nafcanco.  Award ¶ 220.  The Tribunal found

that the only asset of Nafcanco was the NAFTA claim, and that pursuit of the claim was its only

business.  Award ¶ 220.  Because an American corporation may not pursue a claim against the

United States under the NAFTA, all of TLGI's substantive claims under Articles 1102, 1105, and

1110, were dismissed for lack of jurisdiction, whether brought on its own behalf under Article

1116 or on behalf of LGII and the other Mississippi entities under Article 1117.  Award ¶¶ 220-

238.  TLGI has not – and now cannot – challenge this decision.

Similarly, Raymond Loewen's Article 1102, 1105, and 1110 claims brought on behalf of

LGII and the other Mississippi entities under Article 1117 were dismissed on jurisdictional

grounds.  The Tribunal found that Raymond Loewen had failed to adduce any evidence to

establish his stock holdings in TLGI and through it in LGII.  Award ¶ 239.  Thus, he lacked the

13

"direct or indirect" interest needed to pursue a claim on behalf of the American enterprise under the NAFTA.  Award ¶ 239.  As with TLGI, Raymond Loewen has never sought to challenge this ruling and does not do so here.

As to Mr. Loewen's three remaining substantive claims – the Article 1102, 1105, and 1110 claims brought on his own behalf under Article 1116 – he correctly asserts to this Court that the United States never challenged these claims on jurisdictional grounds.  As demonstrated below, however, Mr. Loewen incorrectly asserts that the Tribunal failed to dispose of these claims on the merits.

**The Tribunal's Award: Decision On The Merits**

At the very beginning of the Award, the Tribunal noted that it was addressing the merits of the Article 1102, 1105, and 1110 claims, no matter brought on whose behalf or under which right of action provision:

> As our consideration of the merits of the case was well advanced when Respondent filed this motion [the motion to dismiss TLGI's claims on jurisdictional grounds because of the Nafcanco assignment] and as we reached the conclusion that Claimants' NAFTA claims should be dismissed on the merits, we include in this Award our reasons for this conclusion. (Award ¶ 2)

The Award then devoted over 174 paragraphs of the 242 paragraph Award to discussing the merits of the case.  By contrast, only 21 paragraphs discuss the jurisdictional issues.  Any doubt that the Tribunal did decide these claims on the merits is disposed of by the language of the Award.

For example, the Tribunal noted that evidence needed to establish the Article 1102 claim was facts showing what would have been the "'most favorable treatment accorded, in like circumstances' by a Mississippi court to investors and investments of the United States."  Award

¶ 140.  But the Tribunal concluded that the complainants had simply not produced any evidence to establish this point, and so the critical comparison with their treatment in Mississippi could not be made.  Award ¶ 140.  The Tribunal thus ruled on the merits against the complainants on this point.  Award ¶ 140.  Raymond Loewen has never objected to this holding.

Similarly, the Tribunal disposed of the Article 1110 expropriation claim on the merits, linking its resolution to the findings to be made on the Article 1105 claim:

> Claimants' reliance on Article 1110 adds nothing to the claim based on Article 1105.  In the circumstances of this case, a claim alleging an appropriation in violation of Article 1110 can succeed only if Loewen establishes a denial of justice under Article 1105. (Award ¶ 141)

The remainder of the Award, and much that went before, was devoted to resolving the Article 1105 denial of justice claim.  To determine whether the United States had breached Article 1105, the ultimate issue was whether, under applicable international law, the claimants were denied justice by the United States' judicial process as a whole.  See Award ¶ 137.  This could be the case only if the judicial process available to them could not correct the trial court's purported errors, for example, on the facts here, if the claimants had been denied the right to appeal the trial judgment because of the supersedeas-bond requirement.  See Award ¶ 170.  But, in this case, no denial of justice could be found unless complainants had exhausted all reasonably available judicial remedies to have the supersedeas bond set aside or lowered.  Award ¶¶ 168-169.  It is this one narrow issue – the application of the legal standard of exhaustion to the evidence before the Tribunal – that constitutes the bulk of Mr. Loewen's motion to vacate.

As set out in more detail below, the Tribunal resolved the exhaustion issue by holding that a complainant was required to exhaust all local judicial remedies that were adequate,

effective, and reasonably available.  Award ¶ 168.  Before the Tribunal, two principal remedies

were in issue: (1) a petition for a stay to the U.S. Supreme Court pending resolution of a petition

for certiorari and (2) a filing for a Chapter 11 bankruptcy reorganization.  Award ¶ 207.[2]  After

reviewing the opinions submitted by the parties' experts, the Tribunal found that the claimant's

expert evidence was insufficient to carry its burden of proof because it was directly contradicted

on all points by the government's expert evidence.  See Award ¶¶ 209-211.  The Tribunal then

considered whether TLGI had submitted any evidence that would change this analysis.  The

evidence submitted by TLGI, however – the declarations of Messrs. Carvill and Turner – merely

related to the subjective state of mind of the TLGI Board of Directors.  Ex. 6, Decl. of W.

Carvill; Ex. 7, Decl. of J. Turner.  The declarations contained none of the objective facts on

which the Board presumably based its conclusions.  Id.  Thus, the Tribunal was unable to

evaluate whether the Board's decision to settle the case was the only reasonable option for it to

pursue.  Award ¶¶ 215-216.  The Tribunal, therefore, could not conclude that TLGI had no other

reasonable option but to settle.  As the burden of proof was on complainants, their Article 1105

claim failed.  Award ¶ 217.

**The Request For A Supplementary Decision**

While the Award decided Mr. Loewen's substantive claims on the merits, it neglected to

explicitly refer to them under the rubric of "Article 1116 claims."  To remove any ambiguity as to

this point, the United States requested that the Tribunal issue a supplementary decision under

---

[2]  A third option, collateral attack on the trial court judgment in a federal district court
was also considered.  E.g. Ex. 4, Statement of Drew S. Days at 32-51; Ex. 5, Statement of
Laurence Tribe at 5-16.

Article 58 of the ICSID Arbitration (Additional Facility) Rules.[3]  Ex. 8, U. S. letter to A. Parra

dated Aug. 11, 2003.  Mr. Loewen responded to this request by essentially raising the same

points that he seeks to make here.  In particular, he asserted that the Tribunal had not decided his

personal substantive claims, that the discussion of the substantive claims in the Award were dicta

as to him, and that the dicta was in error because it ignored the uncontradicted declarations of

Messrs. Carvill and Turner.  Ex. 9, Art. 58 Submission as to R. Loewen's Art. 1116 Claim.

The Tribunal denied the United States' request for a supplementary decision on

September 13, 2004.  Ex. 10, Supp. Dec. ¶ 23.  The Tribunal held that it had indeed decided Mr.

Loewen's three substantive claims.  Id. ¶¶ 19, 20, 23.  The Tribunal acknowledged that it had

made "no distinct reference in the Award to a discussion of Raymond Loewen's claim under art.

1116."  Id. ¶ 19.  But it concluded that the three substantive claims were, as the United States

submitted, decided on their merits:

> But the dismissal of all the claims "in their entirety" following the examination of
> the merits was necessarily a resolution of the art. 1116 claim.  That dismissal was
> a consequence of the reasoning expressed in paras 213-216.  We therefore reject
> the argument that the Award did not deal with the art. 1116 claim.  (Id. ¶ 20)

Continuing, it rejected Mr. Loewen's submission as an impermissible motion to reconsider the

Award.

---

[3]  Article 58 (now codified as Article 57) states:  Supplementary Decisions

(1)    Within 45 days after the date of the award either party, with notice to the
other party may request the Tribunal, through the Secretary-General, to
decide any question which it had omitted to decide the award.

(2)    The Tribunal shall determine the procedure to be followed.

(3)    The decision of the Tribunal shall become part of the award and the
provisions of Articles 53 and 54 of these Rules shall apply thereto.

17

> It follows that Respondent is correct when it argues that Raymond Loewen is asking the Tribunal to reconsider its decision to dismiss the claim and to reconsider the reasoning (described by Raymond Loewen as "obiter dicta") which led the Tribunal to dismiss the claim. In the context of the dismissal of Loewen's claims, that reasoning was not merely "obiter dicta." It was the reasoning on which that part of the Award was based and it is not open to the Tribunal to reconsider it. There is no logical basis on which the Tribunal can draw a distinction between the relationship of that reasoning to the dismissal of the [TLGI] claims on the one hand and to the Raymond Loewen claim under art. 1116 on the other hand. (Id. ¶ 21)

Finally, the Tribunal conclusively disposed of any notion that it had not considered the Carvill and Turner declarations, instead noting their failure to support Mr. Loewen's case:

> While the Cargill [sic] and Turner declarations were relied upon to support a view contrary to that reached in paras 215-216 of the Award, they did not satisfy us, in all the circumstances, that the settlement agreement was the only course for Loewen to take. A glaring deficiency was that the declarations failed to "record or identify the information presented to the Board on which it arrived at its conclusion that it should pursue the settlement option." Id. Accordingly, "[t]he declarations did not ground an inference that the settlement option was the only available alternative or that certiorari petition and the bankruptcy petition were not available remedies. (Id. ¶ 22)

## ARGUMENT

### I.      Loewen's Petition Is Time-Barred

The Federal Arbitration Act provides that notice of a motion to vacate, modify, or correct an arbitral award must be served on the adverse party or its attorney "within three months after the award is filed or delivered." 9 U.S.C. § 12. The cases make clear that under section 12 a party to an arbitration may not move to vacate an award unless it has given notice within three months after the award. Kanuth v. Prescott, Ball & Turben, Inc., 1990 WL 91579, at *2 (D.D.C. June 19, 1990) (citing cases); see also Florasynth, Inc. v. Pickholz, 750 F.2d 171, 175 (2d Cir. 1984) (there are no statutory or common law exceptions to this three-month period).

Loewen's petition is barred by this three-month limitations period. The Tribunal entered its Award dismissing all of Loewen's claims on June 26, 2003. <u>See</u> Award at 70 ("Raymond L. Loewen's [claims] are hereby dismissed in their entirety."). On August 11, 2003, the United States, requested a supplementary decision from the Tribunal to "clarify its unanimous Award of June 26, 2003 in one minor respect." Ex. 8.[4] While noting that, "by its terms and its logic, the Award plainly disposes of Raymond Loewen's Article 1116 claims on their merits," the United States sought an express recitation of the disposition of the 1116 claims "[t]o avoid any doubt on the subject." <u>Id.</u> at 2. The United States' letter did not seek any substantive alteration of the award, but merely a more explicit statement that Mr. Loewen's Article 1116 claims were disposed of by the extensive merits discussion in the Award. On September 13, 2004, the Tribunal "refused" the United States' request on the ground that the Tribunal had adequately "dealt with" Mr. Loewen's claims in "its Award . . . including its decisions on the merits." Supp. Dec. 1, 5.

Mr. Loewen's Notice of Motion was served on December 13, 2004, nearly eighteen months after the Award that he now challenges was issued. As such, it is outside the three month limitations period and must be dismissed. Mr. Loewen attempts to evade his untimeliness by

---

[4] Contrary to his assertion, Pet'rs Mem. at 9, nothing precluded Mr. Loewen from seeking himself to vacate the Award. Mr. Loewen could have filed a motion in this Court at any time after the Tribunal's Award whether before or after the United States' sent its letter request. <u>See Olson v. Wexford Clearing Svcs. Corp.</u>, 397 F.3d 488, 492 (7th Cir. 2005) ("A party who is uncertain about the finality or appealability of an arbitration award should err on the side of compliance with the FAA § 12, which is not onerous."); <u>Thyssen Carbometal Co. v. FAI Energy, Ltd.</u>, 1990 U.S. Dist. LEXIS 427, at *8 (D.D.C. Jan. 17, 1990) (motion in federal court to vacate award should be pursued simultaneous with application to arbitrators to correct award in order to comply with three month limitations period of FAA). This omission is glaring in that Mr. Loewen now describes the Award as "extraordinary" and "deficien[t]." Pet'rs Mem. at 9, 19.

pointing to the Tribunal's denial of the United States' request for a supplementary decision, arguing without citing any precedent that his time to move for vacatur started only upon receipt of the Tribunal's decision on that request in September 2004.  Pet'rs Mem. at 10.  Mr. Loewen's contention is without merit.  Numerous courts that have addressed similar questions have found that motions to reconsider or to clarify an arbitral award do not toll the three month time limit set by section 12 of the FAA or other statutes.  Arch Dev. Corp. v. Biomet, Inc., 2003 WL 21697742, at *3 (N.D. Ill. July 30, 2003) (the limitations period prescribed by section 12 is not tolled by an application to modify or clarify an arbitration award); Dreis & Krump Mfg. Co. v. Int'l Assn. of Machinists & Aero. Workers, 802 F.2d 247, 249-50 (7th Cir. 1986) (motion to reconsider arbitral award does not toll time limit for motion to vacate imposed by arbitration law); Int'l Ass'n of Bridge, Struct. & Orn'l Iron Workers v. Burtman Iron Works, Inc., 928 F. Supp. 83, 86-87 (D. Mass. 1996) (same).

Moreover, the ruling refusing the United States' request for a supplementary decision does not alter the Award and is not itself an award.  See Olson v. Wexford Clearing Svcs. Corp., 397 F.3d 488, 492 (7th Cir. 2005) ("The FAA speaks in terms of 'awards,' and we have found no authority suggesting that a letter denying one party's motion to amend a claim is properly characterized as an award.").  As such, its issuance does not cure the untimeliness of Mr. Loewen's Petition.  Id.; Fradella v. Petricca, 183 F.3d 17, 19-20 (1st Cir. 1999) (where arbitrators intend for award to deal with all claims, award is final and time under Section 12 runs from issuance of award, even if arbitrators later issue a correction to the award); Yonir Tech., Inc. v. Duration Sys. (1992) Ltd., 244 F. Supp. 2d 195 (S.D.N.Y. 2002) (motion to vacate was served within three months of letter decision from panel regarding earlier award, but motion was

untimely as it sought to vacate the underlying award which was entered more than three months earlier); Thyssen Carbometal Co. v. FAI Energy, Ltd., 1990 U.S. Dist. LEXIS 427, at *7 (D.D.C. Jan. 17, 1990) (three month limitations period ran from issuance of award not from decision rejecting motion to clarify).  Because Mr. Loewen's notice was served more than three months after the issuance of the Award, his motion to vacate is time-barred.

Mr. Loewen cites no precedent, nor has the United States found any, for the proposition he seeks to use here, namely that the filing of the Request for a Supplementary Decision reset the three-month period for seeking vacatur.  Mr. Loewen's only argument for why he should be able to challenge the Award is that Article 58 of the ICSID Arbitration (Additional Facility) Rules provides that a party may request the Tribunal to decide any issue it had omitted to decide and "[t]he decision of the Tribunal shall become part of the award."  Pet'rs Mem. at 10.  However, Article 58 states that any decision on the issue that the Tribunal "had omitted to decide in the award,"  ICSID Additional Facility Rules 58(1), -- not a decision denying a request for a supplementary decision -- becomes part of the award.  Moreover, even if the Supplementary Decision had become part of the Award, that would not have changed the effective date of the Award, which Paragraph 1 of the Decision reiterates as June 26, 2003.  See Fradella, 183 F.3d at 18-20 (despite February 23, 1998 correction to December 18, 1997 award, the date of the award remained December 18, 1997, and plaintiff's March 25, 1998 motion to vacate was time barred).  Thus, there is simply no basis to conclude that Mr. Loewen's Petition is timely.

Even if the pendency of the United States' request had tolled the time pursuant to Section 12, Mr. Loewen's Petition would still be time-barred under the usual rules applied to the tolling of limitations periods.  Normally, if an event tolls the period, it does not reset the entire period

but merely suspends it as of the date of the filing.  See, e.g., Salinas v. Dretke, 354 F.3d 425, 430

(5th Cir. 2004) (even where a post-judgment filing tolls the statute of limitations, it does so only

for the period from its filing until it is denied, and it does restart the limitations period

altogether).  Here, 45 days had already expired between the issuance of the Award and the United

States' request for a supplementary decision.  Once the Tribunal clarified that the Award was its

final decision on Raymond Loewen's personal claims, he should have been on notice that the

period for vacatur had started to run as of the date of the Award and that, even if it had been

tolled during the pendency of the supplementary request, he now had only approximately 45

more days to seek vacatur from the date of the Supplementary Decision, September 13, 2004.

Thus, Mr. Loewen's petition, which was filed on December 13, 2003, was approximately 46 days

out of time even under this more generous standard.

## II. There Is No Basis To Vacate The Award

The standard of review of arbitral awards by federal courts, a standard ignored in

Petitioner's brief, is "well settled."  LaPrade v. Kidder, Peabody & Co., 246 F.3d 702, 706 (D.C.

Cir. 2001).  That standard is extremely high, making such review "extremely limited."

Teamsters Local Union No. 61 v. UPS, 272 F.3d 600, 604 (D.C. Cir. 2001); accord Revere

Copper & Brass Inc. v. Overseas Private Investment Corp., 628 F.2d 81, 83 (D.C. Cir. 1980)

("This court has acknowledged its restricted function in" reviewing arbitration awards.).  Courts

"do not sit to hear claims of factual or legal error by an arbitrator." Teamsters, 272 F.3d at 604

(quotation omitted)).  Pursuant to this limited review, "a court must confirm an arbitration award

where some colorable support for the award can be gleaned from the record."  LaPrade v. Kidder,

Peabody & Co., 94 F. Supp. 2d 2, 4 (D.D.C. 2000), aff'd, 246 F.3d 702 (D.C. Cir. 2001).

Recognizing the challenge posed by this high standard, Mr. Loewen attacks the Tribunal, accusing it of, among other things, refusing to hear evidence, Pet'rs Mem. at 1, and "acting in manifest disregard of the law", id., specifically referring to the "exceptional nature of the Tribunal's misconduct," id. at 2, and its "lack of honesty," id. at 35.  Such language is, at best, misplaced, where, as here, the arbitrators are a former Chief Justice of the High Court of Australia, a former Law Lord of Great Britain, and a former Chief Judge of the United States Court of Appeals for the District of Columbia Circuit.  Moreover, the very nature and constitution of this panel counsel caution.  This was not a single arbitrator passing judgment, but a panel of three highly experienced jurists unanimously concluding that Mr. Loewen's claims failed.  Indeed, Mr. Loewen selected Lord Mustill and agreed to the appointment Chief Justice Sir Anthony Mason.  The panel was eminently qualified, impartially appointed, and approached the task of deciding claimants' case with the utmost seriousness.  Petitioner's strategy of attacking the panel only underscores the substantial weaknesses of his claims.

Mr. Loewen challenges the Award on three legal bases, claiming: (1) that the Award was incomplete; (2) that the Award was contradictory; and (3) that the Award was made in manifest disregard of the law.  The identical factual premises for the first two bases are twofold – first, that the Award failed to address Mr. Loewen's substantive claims brought on his own behalf and, second, that the Tribunal ignored the uncontradicted subjective evidence of what the TLGI Board of Directors believed was the best option.  The third basis, manifest-disregard-of-the-law, rests on the premise that the Tribunal failed to properly apply the objective standard in determining whether judicial remedies were reasonably available to the claimants.  As demonstrated more fully below, even if this motion to vacate were timely,  the Tribunal dismissed Mr. Loewen's

claims on the merits.  The Tribunal did not manifestly disregard the law but, rather, properly applied the law, and necessarily considered but rejected as irrelevant the evidence of the TLGI Board of Director's subjective state of mind.  The Motion to Vacate should be denied.

### A. The Tribunal Disposed Of All Of Mr. Loewen's Claims On The Merits

It is true, that Mr. Loewen's three substantive claims brought in his personal capacity under Article 1116 were not dismissed on jurisdictional grounds.  But Mr. Loewen errs when he asserts that the Tribunal failed to address his claims on the merits.  The four corners of the Award establish that it plainly did so.

The Tribunal's disposition of the claims on the merits becomes self-evident when the relationship between the substantive and procedural provisions of the NAFTA claims are understood.  The NAFTA contains various provisions that provide substantive rights.  In the arbitration, complainants invoked only three: Article 1102 (National Treatment), Notice of Claim ¶¶ 139-140; Article 1105 (Minimum Standard of Treatment), id. ¶¶ 141-161; and Article 1110 (Expropriation), id. ¶¶ 162-167.  Procedurally, both complainants asserted these three claims in two ways: (1) on their own behalf, invoking their personal right to bring an action under Article 1116, id. ¶¶ 177-178; and (2) on behalf of the United States enterprises (LGII, Reimann Holdings, and Wright & Ferguson Funeral Home), invoking complainants' derivative-type rights as investors to bring an action on behalf of the enterprises under Article 1117, id. ¶¶ 180-181.

Articles 1116 and 1117, therefore, are analogous to the various jurisdictional statutes in the United States Code.  A party may bring a claim arising under a federal statute under the federal question jurisdiction statute, 28 U.S.C. 1331.  But section 1331 does not provide the substantive violation; that has to be provided by a predicate statute, such as 42 U.S.C. § 1983,

24

providing an action for federal violations arising under color of state law.  Here, Articles 1116 and 1117 provided no claim that a violation of the NAFTA had occurred; rather, like section 1331, they merely provided the jurisdictional means for presenting substantive claims.

Notably, regardless of on whose behalf or by whom the substantive claims (Articles 1102, 1105, and 1110) were asserted, the liability allegations for each of these respective claims were identical.  Thus, the Article 1102 claims brought by TLGI on its own behalf were factually identical as those brought by Mr. Loewen on his own behalf and were also the same as those brought by each complainant on behalf of LGII.  Notice of Claim ¶¶ 139-143 (alleging Article 1102 violation but making no distinction between the complainants).  The same is true for the Article 1105 and 1110 claims.  Id., ¶¶ 144-161 (same, Article 1105), 162-167 (same, Article 1110).  Mr. Loewen, himself, brought no claims other than these.  Thus, although twelve claims were asserted – three substantive claims brought four times because each complainant used both Articles 1116 and 1117 – the Tribunal had to analyze the three substantive claims only once, for that analysis would apply no matter who brought the claim or on whose behalf it was brought.

With this understanding, a plain reading of the Award reveals that the Tribunal disposed of the three substantive claims on the merits. As the Tribunal noted at the very beginning of the Award, "[a]s our consideration of the merits of the case was well advanced when Respondent filed this motion to dismiss and as we reached the conclusion that **Claimants' NAFTA claims should be dismissed on the merits**, we include in this Award our reasons for this conclusion." Award ¶ 2 (emphasis added).  Two of the three substantive claims were dismissed summarily. The article 1102 claim failed for a lack of evidence.  Award ¶¶ 139-140.  And the Article 1110 claim was dismissed because it was subsumed, on the facts of this case, within the Article 1105

claim.  Award ¶ 141.  Notably, Mr. Loewen nowhere challenges the Tribunal's findings regarding

Articles 1102 and 1110 in his Motion to Vacate.

The Award then devoted the next 75 paragraphs to deciding whether Article 1105 had

been violated.  The Tribunal held that, to assign international responsibility to the United States

for the actions of its lower courts, the judicial system must be given an opportunity to correct

itself.  Having already decided that the Mississippi trial itself could have violated Article 1105 if

left uncorrected by the judicial process, Award ¶ 137, the Tribunal determined that both the trial

court's and the Mississippi Supreme Court's decisions on the supersedeas bond did not violate

this Article.  Award ¶ 189, 197.  Given these findings, the determinative issue for the Article

1105 claims was whether the appeal of the trial judgment to the Mississippi Supreme Court was

reasonably available in light of the $625 million bond required to prevent execution pending

appeal.  See Award ¶ 170.[5]  That issue, in turn, depended on whether, before settling with

O'Keefe, claimants had exhausted all "reasonably available" local judicial remedies, such as

pursuing a stay and a petition for certiorari on the bond issue to the United States Supreme Court.

Award ¶¶ 168, 207.  As set out in more detail in the next section, the Tribunal concluded that

claimants had not satisfied their burden of demonstrating that settling this matter was the only

reasonable alternative for them to take.  Award ¶ 215.  Accordingly, the Tribunal held that

claimants had failed to establish their Article 1105 claim because they had failed to exhaust

reasonably available local judicial remedies.  Award ¶ 216.

---

[5]  The Tribunal also noted that the exhaustion requirement would apply to the Article
1102 and 1110 claims.  Award ¶ 156.

The Award plainly addressed the merits of the three substantive claims.  While the Tribunal dismissed all of TLGI's claims on jurisdictional grounds, and similarly dismissed Mr. Loewen's claims brought on behalf of LGII, this does not render the Tribunal's conclusions on the merits "dicta."  As to TLGI's claims and Mr. Loewen's Article 1117 claims, these conclusions were alternative holdings to their dismissal on jurisdictional grounds.  As to Mr. Loewen's Article 1116 claims, these conclusions were the holding underlying their denial on the merits.

Consequently, Mr. Loewen is mistaken when he asserts that the Award did not address his personal claims.  His fundamental error is his refusal to discuss the substantive claims, instead repeatedly referring to them as his "Article 1116 claim."  This shorthand reference permits him to assert that the Tribunal never explicitly discussed this "claim."  Technically, he is correct, as even the Tribunal subsequently acknowledged that "there is no distinct reference in the Award to a discussion of Raymond Loewen's claim under art. 1116."  Supp. Dec. ¶ 19.  But this lack of a direct reference does not alter the fact that his three substantive claims were denied by the Tribunal.  As the Tribunal confirmed in its Supplementary Decision:

> But the dismissal of all claims 'in their entirety' following the examination of the merits was necessarily a resolution of the art. 1116 claim.  That dismissal was a consequence of the reasoning expressed in paras 213-216.  We therefore reject the argument that the Award did not deal with the art. 1116 claim." (Supp. Dec. ¶ 20)

Notably, Mr. Loewen implicitly concedes this point by arguing in the remainder of his brief that the Tribunal manifestly disregarded the law and ignored evidence as to the Article 1105 claim.  Pet'rs Mem. at 21-37.  Of course, for the Tribunal to have done so, it would have had to issue a ruling on the merits of the claim in the first instance.  And while Mr. Loewen may

disagree with the ruling, the Court should reject his attempt to hide the fact that a ruling occurred at all.

**B.      The Tribunal Did Not Act In Manifest Disregard Of The Law Nor Refuse to Consider Evidence**

Mr. Loewen's main argument raises two seemingly distinct but closely related points. The first is that the Tribunal manifestly disregarded the law by improperly applying subjective evidence to decide the objective test for exhaustion of local remedies. Pet'rs Mem. at 21-27.  He then curiously complains that the Tribunal ignored his subjective evidence of the TLGI Board of Directors' state of mind when deciding that the objective standard was not satisfied.  Id. at 27-37.  The response to both points is the same.  The Tribunal considered the parties' expert submissions on the question of the reasonable availability of the two local judicial remedies under consideration – a stay pending a petition for certiorari or a bankruptcy filing.  The Tribunal then also looked at claimants' evidence of the factors considered by the TLGI Board in deciding to settle, to determine whether that decision was the only reasonable decision that the Board could have made under the circumstances.  As we explain below, TLGI and Mr. Loewen simply failed to prove that settlement was the only reasonable option for TLGI to take.

But more fundamentally, the scope of this Court's review on this motion is extremely limited. Revere Copper & Brass Inc., 628 F.2d at 83.  This Court does not sit to correct mistaken evidentiary findings or legal holdings of the arbitrators.  Teamsters Local Union No. 61, 272 F.3d at 604.  The motion must be denied if there was merely colorable support for the Tribunal's decision.  LaPrade, 94 F. Supp. 2d at 4.  Here, the submitted testimony of the government's experts on the issues of certiorari and bankruptcy provide ample record support for the Award.

Though Mr. Loewen and his experts may disagree, that disagreement is irrelevant.  This Court does not sit to reevaluate the expert evidence.  Thus, under the very narrow scope of review, this Court must deny the motion to vacate.

### 1.   The Tribunal Did Not Misapply The Objective Standard For Exhaustion Of Local Remedies

Mr. Loewen's manifest disregard of the law claim is quite narrow, focusing solely on the exhaustion of local judicial remedies issue, which formed part of his Article 1105 claim.  Pet'rs Mem. at 21.  As the Tribunal held, before a claimant could recover damages under Article 1105 for judicial action such as the Mississippi judgment, the claimant was obligated to exhaust those remedies that "are effective and adequate and are reasonably available to the complainant in the circumstances in which it is situated."  Award ¶ 168.  As it further explained, that situation included "its financial and economic circumstances as a foreign investor, as they are affected by any conditions relating to the exercise of any local remedy."  Award ¶ 169.

Notably, Mr. Loewen does not contest this finding by the Tribunal.  Rather he claims that the Tribunal misapplied it by relying on subjective evidence to satisfy an objective reasonableness standard.  Pet'rs Mem. at 25.  Though he alludes to the submission of unidentified subjective evidence into the record by the United States, nowhere does Mr. Loewen specify or speculate as to just what evidence the Tribunal wrongly relied on.  Id.  A review of the evidence before the Tribunal and of the Award establishes that the Tribunal did not misapply this standard, let alone manifestly disregard the law in applying it.

### a.  The Standard For Manifest Disregard Of The Law Is Extremely High

"Manifest disregard of the law means more than error or misunderstanding with respect to the law." LaPrade, 246 F.3d at 706 (quotation omitted); accord Al-Harbi v. Citibank, N.A., 85 F.3d 680, 684 (D.C. Cir. 1996); Kanuth, 949 F.2d at 1178. Rather, in order to modify or vacate an arbitral award based on manifest disregard of the law, "a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." LaPrade, 246 F.2d at 706 (quoting DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997)); accord In re Arbitration between Baird & Anthony, 939 F. Supp. 15, 16 (D.D.C. 1996). In other words, "[t]he error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." Kanuth, 949 F.2d at 1178 (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir. 1986)).

As the party seeking to vacate the award, Petitioner bears the burden of "demonstrating that the arbitration panel acted in manifest disregard of the law." LaPrade, 246 F.2d at 706; accord Johnston Lemon & Co. v. Smith, 886 F. Supp. 54, 56 (D.D.C. 1995) (Movant must "establish that the arbitrators appreciated the existence of a governing legal principle but expressly decided to ignore it."). Absent such a showing, "an arbitrator's award must stand even if it arose out of a misinterpretation of applicable law." Howard v. Pep Boys, Inc., 1999 WL 692044 (D.D.C. Aug. 31, 1999).[6] Moreover, an "alleged factual error" or decision not to credit

---

[6] Accord In re Arbitration between Chromalloy Aeroservices & Arab Republic of Egypt, 939 F. Supp. 907, 911 (D.D.C. 1996) (procedural decision that led to alleged substantive mistake at worst constitutes "a mistake of law" and does not rise to manifest disregard of the law); Johnston Lemon, 886 F. Supp. at 56 (misapplication of law is not manifest disregard of the law).

certain evidence does not amount to manifest disregard of the law.  Payne v. Giant Food, Inc.,

346 F. Supp. 2d 15, 25 (D.D.C. 2004).

### b. The Standard For Exhaustion Of Local Judicial Remedies

Under the NAFTA, the Tribunal found that the legal standard for exhaustion of local

judicial remedies was reasonable availability.  Award ¶ 168.  In particular, the Tribunal held that

TLGI had to pursue all local judicial remedies to challenge the Mississippi judgment that were

"effective and adequate and are reasonably available to the complainant in the circumstances in

which it is situated."  Id. ¶ 168.  Reasonable availability included consideration of the

complainant "in the light of its situation, including its financial and economic circumstances as a

foreign investor, as they are affected by any conditions relating to the exercise of any local

remedy."  Id. ¶ 169 (emphases supplied).

Under this standard, the Tribunal found only two situations where exhaustion of local

judicial remedies would not be required:  (1) "[I]n a case where it is highly unlikely that resort to

further remedies will be favourable to a claimant, the correct conclusion may be that local

remedies have been exhausted 'if the cost involved in the proceeding further considerably

outweighs the possibility of any satisfaction,'" and (2) Where the "local remedy 'may reasonably

be regarded as incapable of producing satisfactory reparation.'"  Id. ¶ 166 (quoting David R.

Mummery, The Content of the Duty to Exhaust Local Remedies, 58 Am. J. Intl. L. 389, 401

(1964)).  On these points, "the onus of proof" rested on Mr. Loewen.  Award ¶ 215.  Thus, in

order to satisfy the exhaustion requirement, Loewen was required to show that all of the

potentially available remedies – in particular the Supreme Court option and the bankruptcy

option – were either "incapable" of providing reparation or were both "highly unlikely" to

provide favorable relief <u>and</u> would have involved costs that "considerably outweigh[ed]" the possibility of "any satisfaction."

As the Tribunal explained and as is set out below, Mr. Loewen failed to submit sufficient evidence to convince the Tribunal that settlement was the only reasonably available option. The expert opinions submitted by both parties were in direct conflict. Notably, the experts based their opinions on the circumstances that TLGI faced. At no point then or now did Mr. Loewen or TLGI assert that the government experts overlooked or ignored a pertinent fact, though they completely contested the opinions rendered on those facts. The Award makes clear that after the battle of experts, the Tribunal found the evidence from Mr. Loewen's perspective insufficient to establish that neither the Supreme Court nor bankruptcy options were reasonably available. Because complainants shouldered the burden of proof on this issue, it should have ended here with a ruling against them. But the Tribunal then went an extra step, looking to see if the evidence regarding the TLGI Board of Directors' decision-making process, in particular the declarations of Messrs. Carvill and Turner, provided any additional objective facts about TLGI's circumstances that would reverse the decision about the reasonable availability of the two options. Award ¶ 209, 215, 216. But those two declarations are bereft of such evidence, in essence merely parroting the experts' opinions without stating the underlying facts known to the TLGI Board. Award ¶ 216. As Mr. Loewen himself points out, the issue between the parties on exhaustion was not what, subjectively, the TLGI Board of Directors believed the evaluation of the various options to be but, rather, what an objective evaluation would show. Pet'rs Mem. at 23. Having found the expert evidence in direct conflict and having no other basis on which to

find either the Supreme Court or bankruptcy option were not reasonably available, the Tribunal

correctly found that Mr. Loewen had failed to satisfy his burden of proof.

### c. The Expert Testimony Was In Direct Conflict

The parties' experts disagreed about whether local judicial remedies were reasonably

available in TLGI's situation.  On the issue of the availability of Supreme Court review, the

principal experts were Professor Drew Days for the United States, and Professor Laurence Tribe

for Mr. Loewen.[7]  Both experts agreed that TLGI could have filed for certiorari, a filing that

would have been limited to challenging the Mississippi Supreme Court's decision on the

supersedeas bond.  E.g., Days Statement at 13-16; Tribe Statement at 16-18.

The experts, however, sharply disagreed on the likelihood of success in having the

petition accepted.  Professor Days, a former Solicitor General of the United States, testified that

TLGI "would have had a reasonable opportunity to obtain United States Supreme Court review

of the Mississippi Supreme Court decision" on the supersedeas bond.  Days Statement at 3.  He

held this opinion, in part, because the situation raised an "unsettled question of federal

constitutional law of general interest," namely, whether the Due Process Clause was violated if

the Mississippi bonding requirement prevented an appeal from a trial court judgment.  Id. at 16.

He noted that punitive damages had been a subject in six cases granted certiorari by the Supreme

Court in the prior ten years.  Id. at 24.  Further supporting his position, he noted his belief that the

Supreme Court had reserved this exact question in one of those six cases, Pennzoil v. Texaco,

481 U.S. 1 (1987), thus making it more likely to grant TLGI's request.  Interestingly, Prof. Days

---

[7]  Mr. Loewen also submitted a declaration from Prof. Charles Fried.  Prof. Fried's opinions, however, merely mirrored those of Prof. Tribe and, so, are not referred to here.

noted that Prof. Tribe, representing Pennzoil, had argued in a Supreme Court brief that "whether the Due Process Clause imposes limits of appeal bonds is of surpassing practical significance." Days Statement at 21 (quoting from the Jurisdictional Statement in Pennzoil v. Texaco, No. 85-1798, 1986 U.S. Lexis at *6 (May 1, 1986) (L. Tribe, Counsel of Record)). Prof. Days also noted the potential conflict between the Mississippi Supreme Court's decision denying a reduction in the bond and the decision of several United States Courts of Appeals, thereby making certiorari even more likely. Days Statement at 23-26; see SCT. R. 10. While acknowledging that certiorari was discretionary with the Court, Prof. Days opined that a TLGI petition "would have commanded attention." Days Statement at 18. Indeed, Prof. Days noted that the TGLI's Supreme Court lawyers had drafted a petition for a stay of the Mississippi Supreme Court's order and that the petition mirrored the very issues that Prof. Days deemed cert-worthy. Ex. 11, Reply Statement of Drew Days, III at 4, 6-7. Prof. Days also noted that, while the vast majority of petitions are denied, most of those in his experience as Solicitor General did not even satisfy the basic jurisdictional prerequisites for consideration. Days Statement at 20.

Prof. Tribe disagreed. He felt that the shear odds of selection were generally too small even for meritorious cases. Tribe Statement at 19. He further testified that this case was too fact intensive, making it unattractive to the Supreme Court. Id. at 20-21. He also disagreed that a conflict existed between the Mississippi Supreme Court's decision and other courts. Ex. 12, Reply Statement of L. Tribe at 9-13. In reply, Prof. Days disputed that the fact-intensive nature of this case would impact its worthiness for certiorari, noting that the Supreme Court often uses such cases to announce a broad, general constitutional principle and then apply it to the factual scenario before it. Days Reply Statement at 10-11.

As to the bankruptcy court option, the parties' experts were similarly in conflict.  The

United States submitted testimony from J. Ronald Trost, a distinguished bankruptcy practitioner.

Mr. Trost concluded that under Chapter 11 of the Bankruptcy Code, TLGI could have maintained

its operations and pursued an appeal of the Mississippi judgment without posting a supersedeas

bond.  Ex. 13, Decl. of J. Trost at 8, 11.  He noted that Chapter 11 permits a debtor's management

to continue operating the company with minimal oversight from the Bankruptcy Court.  Id. at 11.

Approval from the court would only have been needed for actions outside the ordinary course of

business.  Id.  Meanwhile, the automatic stay provisions of the Code would have stopped

O'Keefe from executing on Loewen's property and permitted an appeal of the trial judgment with

out the need for a supersedeas bond.  Id. at 8.  Finally, in Mr. Trost's opinion, TLGI could have

maintained its acquisition program because it would have been able to obtain debtor-in-

possession (DIP) financing.  Id. at 12-13.  He specifically noted, that in 1995, TLGI had little

secured debt, thus providing abundant collateral for DIP financing – which is typically secured.

Id.  He also noted that in 1999, when TLGI was subsequently in bankruptcy, it had been able to

obtain over $200 million in DIP financing despite, at that time, already having a significant

amount of secured debt.  Id.

Mr. Loewen's expert disagreed.  Prof. Kenneth Klee agreed that a bankruptcy filing would

have permitted TLGI to pursue its claims without posting a bond, but he felt that the downside of

a filing would outweigh this benefit.  In particular, he noted that in his opinion Chapter 11 was

not well suited for service businesses such as Loewen's where long-term contracts and

relationships were the norm.  Ex. 14, Decl. of K. Klee at 5.  He also disputed the availability of

DIP financing, and even if such financing were available, the ability of TLGI to continue its

acquisition program while under court supervision.  Id. at 6-8.  He also expressed concern that O'Keefe might be able to take over the company in the bankruptcy proceeding.  Ex. 15, Supp. Decl. of K. Klee at 2- 6.  In reply, Mr. Trost pointed out that multiple large service businesses had successfully pursued Chapter 11 reorganization in recent times.  Ex. 16, Reply Decl of J. Trost at 10.  He also reiterated his position that DIP financing would be available and that TLGI's acquisition program could continue while in bankruptcy.  Id. at 11-14. And he pointed out that the risk of O'Keefe, who had an unliquidated and disputed claim, seizing control of TLGI through bankruptcy was slight.  Ex. 17, Supp. Decl. of J. Trost at 11.

Mr. Loewen would have the Court conclude that, based on the evidence provided by his experts, relief from the supersedeas bond was not reasonably available via either a petition for certiorari to the Supreme Court or via a Chapter 11 reorganization.  This, of course, ignores the contrary evidence submitted by the government's experts.  It also ignores the analysis of this evidence in the Award.  On the Supreme Court option, the Tribunal noted:  "The Tribunal is not in a position to decide whether the opinion of Professor Days or that of Professor Tribe is to be preferred."  Award ¶ 211.  Notably, this conclusion was made with the concurrence of Judge Mikva, who, it can be presumed, was fully conversant in the probabilities of certiorari being granted.  Similarly, on the bankruptcy option, the Tribunal stated:  "Whether it was reasonable to expect Loewen to file under Chapter Eleven depends at least in part on the reasons why Loewen elected to enter into the settlement agreement in preference to exercising other options."  Award ¶ 209.  The Tribunal, therefore, was plainly unable to conclude, based on the parties' conflicting expert evidence, that the Supreme Court and bankruptcy options were not reasonably available remedies.  That is, Mr. Loewen's expert evidence failed to carry his burden of proof.

### d.   Claimants Failed To Establish That The TLGI Board's Decision To Settle Was The Only Reasonable Alternative

If the opposing experts' opinions did not provide sufficient evidence to satisfy claimants' burden of proof, the Tribunal was left bereft of evidence as to what the TLGI Board actually considered in deciding to settle.  Mr. Loewen singles out the declarations of Wynne Carvill, a lawyer hired to advise the Board in the aftermath of the Mississippi judgment, Ex. 6 ¶ 3, and John Turner, a member of the Board, Ex. 7 ¶ 2.  But neither of these declarations provided the Tribunal with any evidence that supported a finding that, objectively, TLGI had no other reasonable option but to settle.[8]

For example, the discussion of the Supreme Court option in both declarations is extremely cursory and non-specific.  Mr. Carvill asserts only that:

> While preparing this alternative, we were advised of the difficulty of obtaining such relief.  The advice we received was consistent with the analysis set forth in the statement of Laurence H. Tribe (pp. 16-25) submitted as an attachment to the Company's Memorial.  The chance of success was seen as extremely remote, and reliance on that alternative was further complicated because we did not know how much time we would have to seek relief if the Mississippi Supreme Court denied our application.[9]

_____

[8]   Mr. Carvill, the attorney who settled the Mississippi litigation on TLGI's behalf, see Carvill Decl. ¶ 3, is touted by Mr. Loewen as "**the** witness who could best address the very issue of why TLGI settled," Pet'rs Mem. at 29 (bold in original), although he did not participate in many of the key discussions, Carvill Decl. ¶ 14, and has an incomplete memory, id. ¶ 4 ("I can no longer recall specific details . . . .").

[9]   The time reference here refers to TLGI's ability to have a stay issued by the United States Supreme Court pending later submission and consideration of a petition for certiorari. Professors Day and Tribe also disagreed over the likelihood of a Justice of the Court issuing a stay pending the submission of the petition for certiorari.  Prof. Tribe noted that such stays are rare, especially when denied by a lower court.  Tribe Statement at 16-18.  Here, he felt that TLGI would first have to seek a stay from the Mississippi Supreme Court of its order vacating its temporary stay of the supersedeas bond, a stay that would likely be denied.  Id.  And Prof. Tribe also opined that any stay from a Justice would likely be conditioned on the payment of a

Carvill Decl. ¶ 8.  The discussion by Mr. Turner was even more general:  "The Board was advised by Mr. Carvill that, after consulting with several experts in the area and fully considering all avenues of possible relief in the U.S. federal court system, the possibility of relief from the U.S. Supreme Court was extremely remote . . .."  Turner Decl. ¶ 14.  Aside from Mr. Carvill's allusion to Prof. Tribe, who of course was, in 1996, yet to be hired by TLGI, these declarations presented no facts unique to TLGI that made a petition for certiorari unavailable under the circumstances.

The discussion of the bankruptcy option in the declarations, while appearing more robust, was similarly deficient.  Mr. Turner, in contrast to his one sentence regarding the Supreme Court option, devotes several paragraphs to bankruptcy.  He summarized the Board's concerns as follows:

> (1) that bankruptcy would impact TLGI's access to capital markets for its acquisition program;
>
> (2) that bankruptcy would impact the ability to close acquistions already agreed to;
>
> (3) that bankruptcy would impact the company's goodwill and business reputation, critical to attracting customers;
>
> (4) that bankruptcy would impact the perception that Loewen itself would not be acquired by its competitors, thereby raising doubts in the minds of potential sellers who were attracted to Loewen because it was a friend of the independents;
>
> (5)  that bankruptcy would adversely impact TLGI's share price;
>
> (6) that bankruptcy would distract management; and

---

supersedeas bond, the very situation that TLGI was seeking to avoid.  Reply Statement of L. Tribe at 5.  Prof. Days, on the other hand, noted that there was an emergency/futility exception to the rule normally requiring TLGI to first seek relief from the lower court.  Statement of D. Days at 28-32.  And he noted that TLGI had already been required to post a $125 million bond as a condition of its temporary stay in Mississippi.  Reply Statement of D. Days at 7.

(7) that the reorganization attempt might fail, resulting in liquidation.

Turner Decl. ¶¶ 20-22.  Mr. Carvill similarly noted that concern over access to capital markets

and, additionally, concern over having to seek bankruptcy court approval for acquisitions.

Carvill Decl. ¶¶ 12-13.  But in both cases, no support for the conclusions provided were given.

Each declarant merely stated the conclusion and, at most, that it was based on the advice of

counsel.

All of the information cited above was presented to the Tribunal.  And as the Tribunal

stated when it denied the United States' request for a supplementary decision, the Carvill and

Turner declarations did not establish that settlement was the only course available to TLGI.  In

particular, the Tribunal noted that the declarations failed to present any factual information

considered by the Board on which its decision to settle could be objectively analyzed:

> The declarations did not purport to present a comprehensive record or account of
> the TLGI's Board's consideration of the option which it should pursue.  Nor did
> the declarations record or identify the information presented to the Board on
> which it arrived at its conclusion that it should pursue the settlement option.  The
> declarations did not ground an inference that the settlement option was the only
> available alternative or that the certiorari petition and the bankruptcy petition were
> not available remedies. (Supp. Dec. ¶ 22)

Thus, it cannot be said that the Tribunal ignored or overlooked the declarations of Mr.

Carvill or Mr. Turner.  Moreover, the United States does not concede, as Mr. Loewen contends,

that these statements were uncontradicted.  To the contrary, evidence of record below raised

serious questions as to the reasons for TLGI's and Mr. Loewen's decision to accept the settlement

rather than to pursue the other options.  For instance, it was known that, even as the settlement

was being negotiated, petitions seeking an emergency stay from Justice Scalia had already been

drafted, thus showing that the Supreme Court option was, rather than being dismissed by the

Board, under very serious consideration.  Ex. 18.  And as for bankruptcy, even Mr. Carvill agreed

that the bankruptcy option, which would have permitted Loewen to pursue an appeal without

posting a bond, Carvill Decl. ¶ 12, was "certainly feasible," id. ¶ 4, and was recommended by

counsel, id. ¶ 14.  And, according to Mr. Turner, the costs of bankruptcy and of settlement were

"roughly similar in dollar terms," Turner Decl. ¶ 17.  Thus, the proper conclusion as to how the

Tribunal considered this evidence is, as the Tribunal stated, that the declarations did not "ground

an inference that the settlement option was the only available alternative."  Supp. Dec. ¶ 22.

      Thus, the Tribunal was left with a battle of experts.  As the Tribunal found:

> Here we encounter the central difficulty in Loewen's case.  Loewen failed to
> present evidence disclosing its reasons for entering into the settlement agreement
> in preference to pursuing other options, in particular the Supreme Court option
> which it had under active consideration and preparation until the settlement
> agreement was reached.  It is a matter on which the onus of proof rested with
> Loewen.  (Award ¶ 215)

But because the experts were directly opposed on all major issues, and had failed to persuade the

Tribunal either way, the Tribunal concluded:

> Accordingly, our conclusion is that Loewen failed to pursue its domestic
> remedies, notably the Supreme Court option and that, in consequence, Loewen
> has not shown a violation of customary international law and a violation of
> NAFTA for which Respondent is responsible. (Award 217)

      In summary, while settlement may have been a reasonable option, Award ¶ 216, and Mr.

Loewen's counsel favored it (much as bankruptcy counsel favored the bankruptcy option, Carvill

Decl. ¶ 14), complainants made no showing that settlement was the only course TLGI reasonably

could have taken under the circumstances.  Specifically, they made no showing that either the

Supreme Court option or the bankruptcy option was "incapable" of producing reparation.  Nor

did they show that either the Supreme Court option or the bankruptcy option would have

involved costs that would have "considerably outweigh[ed]" the possibility of "any satisfaction." Under these circumstances, the Tribunal's findings did not amount to a manifest disregard of the law, nor did it ignore any evidence.

### C.  The Cases Cited By Mr. Loewen Are Distinguishable

The cases cited by Mr. Loewen do not support vacatur.  For example, he heavily relies on Application of MacMahon, 63 N.Y.S.2d 657 (Sup. Ct, N. Y. County 1946), for the proposition that courts routinely vacate incomplete awards.  But in MacMahon an arbitrator repeatedly stated in the award that he had not determined one of the issues submitted to him because, in his view, the parties had already settled it.  Id. at 659-660.  "[I]n the face of the express declarations of the arbitrator" the court refused "under the guise of inference" to supply the answer to the issue the arbitrator intentionally chose not to address.  Id. at 660.  MacMahon, therefore, has no application here where the Tribunal made no express statement that it was refusing to decide an issue but, to the contrary, noted that it was proceeding to decide the merits even though it was disposing of most of the claims on jurisdictional grounds.  Award ¶ 2.

Similarly, the only opinion from this jurisdiction cited for remand of ambiguous awards is inapposite here.  In Office & Prof. Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth., 1990 WL 174892 (D.D.C. Oct. 25, 1990), the arbitration panel had awarded an employee back pay.  But in making its award the panel did not address whether the back pay award was to be offset by any interim earnings by the employee.  Because it was a common practice in labor disputes to impose such an offset, the court held that the award was ambiguous. Here, no such ambiguity exists.  While Mr. Loewen may try to read the award otherwise – and by

doing so seek to create ambiguity – as explained above, the Tribunal addressed all three substantive claims and disposed of them on the merits.

And finally, Mr. Loewen's reliance on <u>The United Mexican States v. Metalclad Corp.</u>, 89 B.C.L.R. 3d 359 (Sup. Ct. British Columbia 2001), is also misplaced.  In <u>Metalclad</u>, a Canadian judge applied Canadian law, the International Commercial Arbitration Act, to partially set aside a NAFTA arbitration award.  <u>Id</u>. ¶ 50.  The Canadian law provided that an arbitration award could be set aside if the arbitral panel exceeded its jurisdiction.  <u>Id</u>.  The judge concluded that the right of action provisions of the NAFTA limited claims to only violations of section A of Chapter 11, such as Article 1105.  <u>Id</u>. at 58  The judge then found that two of the findings of the NAFTA arbitration tribunal had been based on matters outside the scope Chapter 11 and, hence, were beyond the jurisdiction of the panel.  <u>Id</u>. at 72, 78.  <u>Metalclad</u> has no application here for several reasons.  First, it applies Canadian not United States' law.  Second, the judge held that  the arbitration tribunal exceeded its jurisdiction because it found a violation of an obligation not contained in Chapter 11.  This is not the case here.  <u>Metalclad</u> can, at best, only establish that a NAFTA arbitration award may be challenged in the courts of one of the signatory parties.  It provides no support that the arbitration award here should be vacated.

### D.  The Tribunal Did Not Otherwise Engage In Arbitral Misconduct

The Federal Arbitration Act permits a court to vacate an arbitral award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a)(3).  Mere error obviously does not rise to the level of "misconduct" or "misbehavior."  "Rather, error that

would constitute misconduct that would justify vacating an award must not simply be an error of law, but one which so affects the rights of a party that it may be said to deprive him of a fair hearing." Cearfoss Constr. Corp. v. Sabre Constr. Corp., 1989 WL 516375, at *3 (D.D.C. Aug. 14, 1989). "Absent substantial misconduct that prejudiced plaintiff's case before the arbitrator, this Court has no authority to modify or vacate an award by a qualified arbitrator that is the result of a process that appears to have afforded plaintiffs an opportunity to fully and fairly adjudicate their claim." Bryson v. Gere, 268 F. Supp. 2d 46, 50 (D.D.C. 2003).

There is no allegation that the Tribunal failed to admit any evidence that petitioner tendered. Rather, the Petition alleges that the arbitrators engaged in "misconduct" because they did not consider the Carvill and Turner declarations to be sufficiently compelling on the relevant issue, namely whether settlement "was the only course which Loewen could reasonably be expected to take." Award ¶ 215. As described above, these declarations are not compelling on that crucial point. Moreover, the fact that the Tribunal did not weight the evidence in the same manner as petitioner is simply not "substantial misconduct," Bryson, 268 F. Supp. 2d at 50, that "may be said to [have] deprive[d] [Loewen] of a fair hearing," Cearfoss, 1989 WL 516375, at *3. See Teamsters, 272 F.3d at 604 (Courts "do not sit to hear claims of factual or legal error by an arbitrator." (quotation omitted)). It is after all the arbitrators and not petitioner who are "charged with the duty of determining what evidence is relevant and what is irrelevant." Fairchild & Co. v. Richmond, Fredericksburg & Potomac R.R. Co., 516 F. Supp. 1305, 1314 (D.D.C. 1981); accord Berlacher v. Painewebber Inc., 759 F. Supp. 21, 24 (D.D.C. 1991); cf. Nat'l Ass'n of Broadcasters v. Librarian of Congress, 146 F.3d 907, 931 (D.C. Cir. 1998) ("Simply because a claimant presented strong evidence of one type does not compel the conclusion that an award

based on <u>all</u> of the evidence should have been different:  the Tribunal's ultimate decision necessarily rested upon composite judgments as to the overall strengths of the evidentiary case submitted in support of and against a . . . claim.").

Mr. Loewen's claims of arbitral misconduct are based on the alleged failure of the Tribunal to address his substantive claims and alleged failure to consider his irrelevant evidence of the Board's state of mind, an allegation that even he incongruously argues it should not have done.  As set out above, neither of these allegations is factually true.  But even if this Court were to find that the Board's state of mind was relevant, the Award should still be upheld.  For the government's experts, having taken into account TLGI's circumstances, all opined that both the certiorari option and the bankruptcy option were reasonably available.  Thus, there was ample record evidence for the Tribunal to conclude that TLGI should have exhausted these reasonably available local remedies before seeking recovery of damages from the United States for the actions of the Mississippi trial court.

## CONCLUSION

For the foregoing reasons, respondent the United States of America respectfully requests that petitioner Raymond Loewen's Motion to Vacate and Remand Arbitration Award be denied.[10]

---

[10]  The United States wishes to note the narrow scope of this Court's authority should it grant this motion.  Mr. Loewen has challenged only the dismissal of his three substantive claims brought on his own behalf under Article 1116.  Accordingly, any vacatur of the arbitration award would not affect either the dismissal of his claims brought under Article 1117, nor any of TLGI's claims.  Additionally, Mr. Loewen seeks to have this Court order that a new Tribunal hear any remand.  With respect, the procedures for consideration of claims under the NAFTA are contained therein and in the rules of arbitration available thereunder.  Accordingly, any action by this Court should be limited solely to the narrow vacatur set out above, and Mr. Loewen should have to proceed as the NAFTA permits in any new proceeding.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

 /s/ Ronald J. Wiltsie, II

| | |
|---|---|
| Mark A. Clodfelter | Ronald J. Wiltsie, II |
| Andrea J. Menaker | Jeffrey Smith |
| Jennifer Toole | U.S. DEPARTMENT OF JUSTICE |
| U.S. DEPARTMENT OF STATE | Civil Division |
| Office of the Legal Adviser | Federal Programs Branch |
| 2201 C Street, N.W. | 20 Massachusetts Avenue, N.W. |
| Suite 5519 | P.O. Box 883 |
| Washington, D.C. 20520 | Washington, D.C. 20530 |
| | Tel: (202) 307-1401 |
| | Fax: (202) 616-8470 |

Counsel for Respondent

March 25, 2005